COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

THEODORE MICHAEL BERRY, §

Appellant, §

v. §

THE STATE OF TEXAS, §

Appellee. §

§

No. 08-06-00176-CR

Appeal from the

409th District Court

of El Paso County, Texas

(TC# 20040D06329)

**O P I N I O N**

Appellant was tried and found guilty of capital murder by a jury. The State sought the death penalty, but the jury answered a mitigation special issue affirmatively. Appellant was sentenced to life imprisonment.

**I. SUMMARY OF THE EVIDENCE**

On September 24, 2004, Appellant visited two former neighbors, Marylynne Thau and Patricia Leanos, at the Warren Inn Apartments on Mesa Street in El Paso. Appellant smelled of alcohol and his speech was slurred, although he could walk normally. Appellant repurchased a gun that he had bought from Thau on a prior occasion. On that occasion, he had purchased the gun and taken it to the desert and fired it. He returned the gun four or five days later. While at the apartment, Appellant appeared to be intoxicated, and he dropped the gun several times.

Officer Daniel Delgado of the El Paso Police Department testified that on the morning of September 25, 2004, he and his partner, Officer Andrew Barcena, were patrolling on the west side of El Paso. They were in a marked car, and both were wearing patrol uniforms. Officer Delgado

testified that they were both in the lawful discharge of their duties as police officers. At 12:49 a.m., they heard a dispatch call to 612 Bristol Street. They responded to the call, which included a report that there was an intoxicated man and a family disturbance. They did not utilize the overhead lights or the siren on the patrol car. The call was upgraded to indicate that the man involved had forced his way into the residence through the garage. The call was upgraded again to an assault in progress.

When they arrived at the scene, Officer Delgado observed that the left garage door was closed, but the right side garage door was open about two and one-half feet from the ground. Officer Delgado looked under the opening and was able to observe that the lights inside the garage were on,[1] but he was unable to lift the garage door higher. Officer Delgado, who was the more senior officer, told Officer Barcena that they were going to enter the garage, and Officer Barcena entered first. Officer Delgado then entered. Due to the position of the door, Officer Delgado stated that he had to get on all fours in order to enter the garage. Officer Delgado went to the right side of the garage, while Officer Barcena went to the left side, near a gray trash can. At that time, Appellant came into the garage from the door that lead into the house. Officer Delgado testified that Appellant took out a gun, pointed it at Officer Barcena, and pulled the trigger. The gun clicked, but did not fire. Appellant then moved to the left, focused upon Officer Delgado, and fired directly at him. Officer Delgado saw the gun actually discharge, and he moved to the right and held on to the right-side wall of the garage. At the same time the gun was fired, he heard a Taser gun discharge. Officer Barcena ran toward Officer Delgado as he tried to leave the garage. Officer Delgado also decided to vacate the garage and seek cover. Appellant fired his weapon at them again as they left.

---

[1] Solomon Saucedo, a neighbor, testified at trial that he heard two gunshots. He looked out his window and saw that Appellant's right-side garage door was half-open and that the lights inside the garage appeared to be on. Also, Officer Rafael Espinoza, who was in the second unit to respond, testified that one of the garage doors was partially open when he got to the scene and the lights in the garage were on.

Officer Delgado exited the garage first, followed by Officer Barcena. Officer Barcena yelled out that he had been shot. No words were ever exchanged between any of the three individuals in the garage, and the officers never verbally announced themselves as police officers. As he and Officer Delgado ran to the adjacent residence, Officer Barcena lost consciousness and collapsed on that property. Officer Delgado saw Appellant go towards their patrol unit. Officer Delgado dragged Officer Barcena towards a car parked nearby. Officer Delgado yelled to Appellant to lie on the ground; Appellant responded repeatedly, "Fuck no," and "fuck you."

Appellant moved to the area near the trunk of the patrol car. Other police units began to arrive at the scene. Appellant was ordered to show his hands and place himself face-down on the ground. Appellant refused to do so, and he repeatedly stated, "fuck you," "no, spic," and "fuck, no, fuck you, fuck you, spic." Appellant then walked toward the front of the patrol car. The other officers rushed him, and Officer Eric Gonzalez tackled Appellant. Appellant resisted arrest, but he was taken into custody.

On September 25, Dr. Corinne E. Stern, then the Chief Medical Examiner for El Paso County, performed an autopsy on Officer Barcena. Dr. Stern testified that Officer Barcena had a gunshot wound to the left buttock. The bullet went up through his pelvis and perforated his right internal iliac artery. He bled to death internally. The trajectory of the bullet was consistent with a body position where Officer Barcena was crouched on his hands and knees.

In the late afternoon of September 25, Appellant signed a written confession regarding the events leading to the death of Officer Barcena. The confession provided, in pertinent part:

> When I went on the day this happened, I had been drinking vodka that I had bought from Cowtown Liquors on Mesa. It was a fifth or a little smaller, Skol brand. I heard my wife. She was yelling that she had the police on the phone. I don't know why she called the police.

. . .

When I got home, I didn't have the gun with me. I remember parking the car, but I don't remember if I went in through the garage or the glass door in the back. When I got inside, Stephanie was yelling at me that she had called the police. I got the gun down from the kitchen cabinet. Stephanie was on the phone, I guess, with the police.

I went out into the garage with the gun. The lights were on in the kitchen and the garage. I was thinking that I wanted to kill myself. I saw the police. I know they were policemen because – because they were in uniform. There were two of them.

I pointed the gun in the general direction of the policemen, and I pointed at one policeman, I think on the right, and I pulled the trigger to the gun, and I heard it click, like from a misfire. Then I pointed the gun at the other policeman and pulled the trigger again, and I heard the gun fire. Then I pulled the trigger again, and I heard the gun fire again.

The policemen were trying to get out or come into my garage through the half-open garage door, but I'm not sure. I think when I was firing the gun, I was using one hand, but I'm not sure.

. . .

After I got the cigarette, I walked outside, and there was a police car by my driveway, and I went over to it and sat down. The police were outside, and I want to say I went out with my hands up, but then I put them down. The police were telling me to put my hands up, and I would tell them, "No, fuck no." I don't know why I was telling them no.

A little while later, I started walking to the front of the police car, and I was tackled by the police. I got put into the police car, and I think they took me to Thomason. I don't know if I actually hit anyone.

Officer Juan Montelongo, who worked as a crime scene officer for the El Paso Police Department, testified that the distance between the left side of the door leading into the house and the spot where Officer Barcena's Taser gun was found was about 8 feet, 8 inches, and the garage was approximately 25 by 18 feet. The distance between the left side of the door into the house and the opening of the garage was about 19 feet, 6 inches.

During the defense portion of the trial, Appellant utilized the testimony of his wife, April

Stephanie Berry. She testified that she and Appellant had moved into their house on September 15, 2004. Appellant had been drinking excessively, and he is an alcoholic. On September 24, Stephanie and Appellant had gone to talk to their landlord. Appellant had been drinking. At around 3:30 in the afternoon, Appellant was supposed to go to a psychiatric appointment for treatment for his alcoholism. He did not return home in the evening.

Stephanie testified that she suffers from manic-depressive disorder, and she was in a manic stage. She wanted to show Appellant that she was mad and was tired of his drinking. She put his possessions outside the house and locked the doors. She secured the garage doors with slats, rope, and a broom, although she was unable to secure the right-side garage door very well. Stephanie testified that she called 911 to program the number into her phone, because she was angry at Appellant, and she wanted him to go to jail.

Stephanie continued that Appellant arrived home at around 12:30 a.m. He attempted to come into the house from the door that went out to the garage. She told him to leave. He refused, and she told him she was going to call 911. He asked for what reason, and she replied that she was going to tell them he was trying to break into the house. He did not respond to that remark. Appellant moved around to other areas outside the house, and he then went back to the garage. Stephanie again called 911 and related that Appellant was not supposed to be there. She denied that the reason for her securing the garage doors and for her calling 911 was because she was afraid of him. Stephanie testified that Appellant kicked at the back door of the house and that she again called 911 and, on this occasion, she told the operator that Appellant was going to kill her. She testified that she did not say that because she was actually afraid that Appellant would assault her, but because she wanted him to leave.

Appellant was able to enter through the door to the garage and went to the kitchen. Stephanie

testified that she told Appellant that the police were "going to be all over you," and that the police had arrived and were coming in the house. She stated that Appellant did not seem to understand when she told him that.

Stephanie stated that they heard loud noises coming from the garage. She assumed it was the police. The noises continued, and Appellant went towards the garage. The light in the garage was off. She saw a black object that she thought was a gun in the front of his pants. She heard a bang, and she thought the police had shot Appellant. She heard another bang. She then saw Appellant re-enter the house from the garage, and she became frightened. She went into a room in the house, raised the mini blinds and opened the window. She crawled out the window and went into a neighbor's yard. She still had the phone. She told the 911 operator that she did not want her husband to see her, because she was afraid he would shoot her. She called again and reported about past threats made by her husband and that he had stated that he was never going to jail again. Eventually, Stephanie was taken to the police station in order to make a statement.

Appellant testified in his own defense. He stated that, after he left the Warren Inn Apartments, he arrived home, and he remembered hearing his wife yell into the phone that, "He's breaking into the house." Appellant then heard her state, "I have the cops" – or "I have the police on the phone." He next remembers asking her, "Who's breaking into the house?" Appellant testified that he thought someone else was breaking into the house. He also remembered knocking on the back door and then kicking it.

Appellant testified that the next thing he remembered was standing in his garage. He saw someone standing on the other side of the car in the garage. He pointed his gun at that person, who he thought was breaking into his home. He pulled the trigger, but the gun only clicked or misfired. He lost sight of the person, who seemed to have disappeared. He fired the gun again over the car.

He did not remember whether the lights in the garage were on. Appellant related that he then saw a person sneaking under the garage door, and he pointed his gun directly at the person. He diverted his aim before actually firing the gun.

Appellant testified that he then went back into the house. He was shaken. He heard someone state, "They're here," and he assumed that the police had arrived after having been called by his wife. Appellant went outside to greet the police; however, he did not see anyone in the patrol car. He heard yelling, but he was unable to see anyone. When he looked into the patrol car, numerous people got on him, and he was taken to the ground. Appellant testified that he had not intended to kill anyone, and that, if he had known the person in the garage was a police officer, he would not have discharged his weapon. Appellant acknowledged that his conduct in carrying the gun into the garage was reckless.

On cross-examination, Appellant stated that he heard his wife state to the 911 operator, "He said that if he ever goes to jail again, that he's taking – he's going to go for a reason." He stated that he either didn't make that statement or he didn't remember making it. He also testified that he heard his wife state to the 911 operator that she was afraid he would kill her. Appellant testified that he had loaded the gun at some time from when he purchased it to the time he shot Officer Barcena. Also, he recalled firing the gun three times. Appellant stated that he knew, based upon his prior military experience, that the gun he had was a dangerous weapon and that firing such a weapon could kill someone. He testified that he was familiar with the weapon, and he knew how to load it, and he knew it was a double action revolver. Appellant stated that he did not believe he intended to kill anyone, but he acknowledged that pointing a revolver at someone a short distance away could show intent to kill, and, when he pointed the weapon at the person who was on the other side of the car, he probably intended to shoot him, which could possibly cause a death.

## II. DISCUSSION

In Issue No. One, Appellant asserts that the court erred by not allowing him to present testimony from an expert regarding intoxication and a person's diminished capacity to perceive events while under the influence of alcohol.

The evidence at trial revealed that at 2:50 a.m. on September 25, Appellant was taken by the police to Thomason Hospital for evaluation. Dr. John F. Haynes examined Appellant. Dr. Haynes testified that, while Appellant would not speak, it appeared that he understood simple instructions. Appellant appeared to know where he was and the reason for his being in the hospital. Dr. Haynes testified that Appellant appeared to be able to speak. The witness stated that he did not feel that Appellant was intoxicated from observing his actions; however, some of the nurses had commented that Appellant's speech was slurred, so he suspected that Appellant was intoxicated.

The blood test taken at the hospital showed that Appellant's blood alcohol concentration at 2:30 a.m. was .274. Dr. Haynes testified that someone at that level was quite intoxicated. However, Appellant appeared to be coordinated in his movements, his speech was not particularly slurred, and he moved about easily. He stated that Appellant probably had a high tolerance to alcohol, and he did not exhibit the external effects of intoxication as readily as an individual who was unaccustomed to drinking. Dr. Haynes testified that alcoholics could perform repetitive skills at high levels of intoxication, although that does not indicate that those acts were necessarily performed involuntarily.

Outside the presence of the jury, Appellant presented the testimony of Professor Bankole Johnson, a licensed physician, a professor of neuroscience, and psychiatrist who has worked extensively in the field of alcoholism. Professor Johnson testified that an individual who drinks alcohol for a long time develops a tolerance to the effects of alcohol on the liver, but one does not develop a whole body tolerance, which means that the brain does not become tolerant to the effects

of alcohol.  Professor Johnson also testified concerning the loss of visual acuity due to intoxication and the impairment of threat perception. Further, an individual intoxicated at the same level as Appellant would be severely impaired in aiming a gun.  Professor Johnson's testimony was purportedly offered to show Appellant's impaired state and not to indicate what his intent was at the time.  The court ruled that the witness could not testify with regard to that matter.  He was allowed to testify regarding his opinion concerning the advisability of releasing Appellant from the hospital, and also to the question of whether alcoholics develop a tolerance to alcohol.  He was also allowed to testify regarding Appellant's condition and its effect on the voluntariness of the confession.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard.  *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).  An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles.  *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).  We give the trial court wide discretion and latitude in its decision and will not reverse an evidentiary ruling as long as it is within the zone of reasonable disagreement.  *Torres*, 71 S.W.3d at 760.  A trial court's ruling on admissibility should not be disturbed under an abuse of discretion standard simply because we might decide a question differently from the trial judge.  *West v. State*, 121 S.W.3d 95, 100 (Tex. App.--Fort Worth 2003, pet. ref'd) (citing *Montgomery*, 810 S.W.2d at 391).  An appellate court may uphold the trial court's ruling on the admission or exclusion of evidence on any legal theory or basis applicable to the case.  *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002).

Appellant cites *Jackson v. State,* 160 S.W.3d 568 (Tex. Crim. App. 2005), to demonstrate that the court erred in not admitting that portion of Professor Johnson's testimony concerning Appellant's diminished capacity to perceive events under the influence of alcohol and to show its effects on Appellant's *mens rea* at the time of the offense.  In *Jackson*, the Court of Criminal

Appeals stated that Texas does not recognize "diminished capacity" as an affirmative defense, that is as a "lesser form of the defense of insanity." However, the court distinguished those situations in which mental-health evidence is presented, not as part of an attempted affirmative defense, but rather, as an attempt to negate the *mens rea* element of the charged offense. In such a case, the evidence is admissible, assuming it meets the requirements of Rule 403. *Id.* at 573. The court stated:

> Even if evidence is relevant to an element of the offense, the trial court still must determine whether the evidence is admissible. Therefore, the trial judge has discretion to determine whether evidence of mental illness may be presented to negate the element of *mens rea*, or whether the evidence should be excluded on special grounds.

*Id.* at 574.

One such special ground exists, in that the Legislature has passed section 8.04 of the Texas Penal Code. This section provides in relevant part:

> (a) Voluntary intoxication does not constitute a defense to the commission of crime.
>
> . . .
>
> (d) For purposes of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

TEX. PENAL CODE ANN. § 8.04(a) & (d).

First, we note that the *Jackson* case deals with an involuntary state as opposed to voluntary intoxication. However, to the extent, if any, that *Jackson* may apply to lack of capacity to form *mens rea* other than mental illness, we find that the trial court did not err in disallowing portions of Professor Johnson's testimony, in light of the foregoing statute. Under section 8.04, voluntary intoxication cannot constitute any defense to the commission of a crime. *Rojas v. State,* 986 S.W.2d 241, 247 (Tex. Crim. App. 1998); *Taylor v. State*, 885 S.W.2d 154, 156 (Tex. Crim. App. 1994).

Section 8.04(d) clearly states that, "'intoxication' means disturbance of mental or physical capacity resulting from the introduction of any substance into the body." TEX. PENAL CODE ANN. § 8.04(d). Professor Johnson's testimony would have addressed the effect of Appellant's ingestion of alcohol on his physical capacity that morning. Because Appellant's physical incapacity due to his voluntary intoxication would not constitute a defense, we conclude that any evidence on this issue would not be relevant. Accordingly, we conclude that the trial court did not abuse its discretion when it excluded Professor Johnson's testimony on this point. We reject Appellant's first issue. Issue No. One is overruled.

In Issue No. Two, Appellant contends that the court erred by denying his motion for directed verdict on the grounds of legal insufficiency of intent. Specifically, Appellant argues that there was insufficient evidence to show he intended to cause the death of Officer Barcena.

In reviewing the legal sufficiency of the evidence, we are constrained to view the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could find the essential elements of the offense, as alleged in the application paragraph of the charge to the jury, beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). More particularly, sufficiency of the evidence should be measured by the elements of the offense, as defined by the hypothetically-correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 239-40 (Tex. Crim. App. 1997).

Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable doubt. *Dwyer v. State*, 836 S.W.2d 700, 702 (Tex. App.--El Paso 1992, pet. ref'd). We do not resolve any conflict in fact, weigh any evidence or evaluate the credibility of any witnesses, so the fact-finding results of a criminal jury trial are given great deference. *Menchaca v. State*, 901 S.W.2d 640, 650-52 (Tex. App.--El Paso 1995, pet. ref'd); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App.

1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); *Leyva v. State*, 840 S.W.2d 757, 759 (Tex. App.--El Paso 1992, pet. ref'd); *Bennett v. State*, 831 S.W.2d 20, 22 (Tex. App.--El Paso 1992, no pet.). Instead, our only duty is to determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *Adelman*, 828 S.W.2d at 421-22. In so doing, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson*, 819 S.W.2d at 843 (quoting *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). The trier of fact, not the appellate court, is free to accept or reject all or any portion of any witness's testimony. *Belton v. State*, 900 S.W.2d 886, 897 (Tex. App.--El Paso 1995, pet. ref'd).

A person commits capital murder if he intentionally or knowingly causes the death of a peace officer acting in the lawful discharge of official duties and who the defendant knows is a peace officer. TEX. PENAL CODE ANN. § 19.03(a)(1). As his sole contention regarding the legal sufficiency of the evidence, Appellant cites *Kinnamon v. State*, 791 S.W.2d 84, 88-89 (Tex. Crim. App. 1990), for the proposition that, in a capital murder case, the defendant must not only have intended to engage in the act that caused the death, but he also must have specifically intended that death result from that conduct; the mere intent to pull the trigger of a firearm will not satisfy the statute. Appellant maintains that the State has failed to prove that he specifically intended to cause the death of Officer Barcena.

However, in this case, the evidence indicates more than just an intent to pull the trigger. Intent to kill may be inferred from use of a deadly weapon, unless, in the manner of its use, it is reasonably apparent that death or serious bodily injury could not result. *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. 1984); *Childs v. State*, 21 S.W.3d 631, 635 (Tex. App.--Houston [14th Dist.] 2000, pet. ref'd). Further, where a deadly weapon is fired at close range, and death

results, the law presumes an intent to kill. *Childs,* 21 S.W.3d at 635.

Here, the evidence adduced at trial from Officer Delgado reveals that Appellant walked into the garage and pointed a gun directly at Officer Barcena, although, on that first occasion, the gun misfired. Officer Delgado also testified that Appellant then stepped to the left, focused on him, and then fired directly at him. Appellant then fired at the officers as they attempted to escape by crawling beneath the partially-closed garage door. Appellant was a short distance from Officer Barcena when he fired, both officers were in full uniform, and the garage was lit. There was evidence that Appellant was told the police were coming, and then, that they had arrived, although it was disputed whether Appellant understood that information. This is all evidence that would allow the jury reasonably to infer that Appellant intended to cause Officer Barcena's death. *See Rojas v. State*, 171 S.W.3d 442, 447 (Tex. App.--Houston [14th Dist.] 2005, pet. ref'd).

Further, to determine culpability, the jury is entitled to consider events that occurred before, during, and after the commission of the offense. *Davila v. State*, 952 S.W.2d 872, 875 (Tex. App.--Corpus Christi 1997, pet. ref'd). Appellant demonstrated hostility to the police after the shooting. He utilized expletives and racial epithets, and he refused to accede to their commands.

Importantly, Appellant stated in his confession that:

> I pointed the gun in the general direction of the policemen, and I pointed at one policeman, I think on the right, and I pulled the trigger to the gun, and I heard it click, like from a misfire. Then I pointed the gun at the other policeman and pulled the trigger again, and I heard the gun fire. Then I pulled the trigger again, and I heard the gun fire again.

Viewing the evidence in the light most favorable to the jury, we find that the evidence is legally sufficient to support the conviction. Issue No. Two is overruled.

In Issue No. Three, Appellant maintains that the evidence is factually insufficient to support the conviction. Appellant makes contentions similar to those in his argument that the evidence was

legally insufficient with the addition that he asserts that the evidence clearly shows a bias in favor of the police given that the evidence indicated that both police officers entered into Appellant's garage unannounced.

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the first prong of *Johnson*, we cannot say that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit, had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial, simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that the evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.*

In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *Sims v. State,* 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). The fact finder alone determines what weight to place on conflicting testimony, because that determination depends on the fact finder's evaluation of witnesses' credibility and demeanor. *Cain*, 958 S.W.2d at 408-09. As the sole determiner of the credibility of the witnesses, the fact finder may choose to believe all, some, or none of the testimony presented. *Id.* at 407 n.5.

As stated, the State's evidence indicated that the two officers entered the garage in full uniform and that the light in the garage was on. They had reports that a dangerous situation was

unfolding. Appellant was told the police were called. Whether he understood those statements was a matter for the jury to resolve. The 911 operator was told that Appellant had previously stated that he would only go back to jail for a good reason. There was evidence the light was on in the garage, and both officers were a relatively short distance from Appellant. Appellant exhibited hostility to the police and resisted arrest.

Appellant's evidence indicated that he misunderstood what his wife was saying and thought he was shooting at intruders. He testified at trial that he did not recall whether the light in the garage was on,[2] but that the officers did not announce themselves as police.

We did not find that the great weight and preponderance of the evidence contradicts the verdict. It was the jury's function to believe or disbelieve Appellant's version of events, and the jury could justifiably have come to the conclusion that Appellant was guilty of the charged offense. Issue No. Three is overruled.

In Issue No. Four, Appellant contends that the court erred in denying his motion to suppress his confession. Specifically, Appellant argues that his confession was involuntary, because he was still suffering from the effects of intoxication when the police took his statement.

In addition to the testimony of Dr. Haynes, described above, concerning Appellant's first admission to Thomason Hospital, the evidence at trial pertinent to the confession indicated that at 11:30 a.m. on September 25, Sergeant Ricardo Elias was told that Appellant had awakened in his cell at the Crimes Against Persons office. Appellant was cold and Sergeant Elias gave him a shirt and some food. At about 1:30 p.m., Sergeant Elias indicated to Appellant that he wanted to have another blood-alcohol-level evaluation; Appellant agreed that that would be a good idea.

---

[2] In the statement he gave the police on the day of the shooting, Appellant stated that the light was on.

Sergeant Elias had Appellant read the *Miranda* warnings.[3]  Appellant indicated that he understood his rights, and he signed and dated the card and wrote the time.  Upon arriving at the hospital, they conversed generally for about an hour.  Sergeant Elias stated that Appellant was coherent and did not exhibit slurred speech.

Jacqueline Roberts testified that she was the nurse who attended to Appellant on his second admission to the hospital.  She testified that Appellant was cooperative and had appropriate responses to questions posed to him.  Furthermore, she had no problems communicating with him; his speech was sensible, not slurred, and she did not smell alcohol about his person.  He appeared alert and lucid.  His blood alcohol concentration at 1:55 p.m. was .068.  Nurse Roberts testified that she was not surprised about Appellant's normal demeanor, because .068 does not indicate a high level of alcohol in the blood.

They returned to the Crimes Against Persons office.  Shortly thereafter, Sergeant Elias re-administered the *Miranda* warnings.  Appellant stated that he understood the rights contained on the card, and he indicated to Sergeant Elias that he wanted to waive those rights and speak with the sergeant regarding what had occurred.  Appellant again signed, dated, and indicated the time of 3:45 p.m. on the card.

The interview then proceeded, and Sergeant Elias testified that he typed out what Appellant related concerning the killing.  Appellant signed the statement and, after making corrections, signed a reprinted corrected statement after comparing the two documents for several minutes.  Sergeant Elias testified that Appellant's blood alcohol level was below the legal limit for driving when he gave his confession, and he had no difficulties conversing with Appellant.  Detective Joe Baca was present at times during the interview.  He testified that Appellant did not appear intoxicated.

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

Appellant testified that he was unable to read the *Miranda* warnings or his statement, because he did not have his glasses. Although he acknowledged he had been given a magnifying glass, he stated that the words "just kind of jumped out . . . ." Appellant stated that, "I pretty much understand my rights." Appellant denied that he told Sergeant Elias that he saw the officers in uniform. He acknowledged that some statements in the confession were correct, but he asserted that Sergeant Elias left out his wife's statement, "he's breaking into the house." Also, he denied that he stated to Sergeant Elias that she had yelled that she had called the police, that he knew they were policemen, or that he had pointed his gun at policemen.

Appellant also stated that, when he was taken to Thomason Hospital for re-evaluation, he was not yet having a hangover, and he was probably still drunk. While he was a lot less intoxicated, he was still in a fog. However, on cross-examination, Appellant stated that he basically knew what he was doing.

Dr. Bankole Johnson testified for the defense that someone with a blood alcohol concentration of .068, while not legally intoxicated, is not competent and is too impaired to make the decision whether to speak to an officer about an offense such as capital murder. Dr. Johnson testified that an individual's ability to think clearly through the issues, and his ability to understand fully the magnitude, or the consequences, of his actions would be impaired. This impairment starts at a blood alcohol concentration of .02. On cross-examination, the witness stated that Appellant eliminated alcohol at the rate of .019 per hour. Accordingly, his blood alcohol concentration would have been about .049 at 3 p.m., .030 at 4 p.m., and approximately .011 when he signed the statement at 5:15 p.m.

The court denied Appellant's motion to suppress the confession. The court made the findings that: prior to and during the giving of any written statements, Appellant intelligently, knowingly,

and voluntarily waived his rights; Appellant had a BAC of .068 at the time he gave his written statement; he was not, however, so under the influence of alcohol or narcotics while making his statement that he was incapable of understanding his actions; and Appellant was coherent and understood what was occurring when he confessed. The trial court concluded that all the statements were made voluntarily.

In reviewing the voluntariness of a confession, almost total deference must be given to the trial court's determination of historical facts in a suppression hearing. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *O'Hara v. State*, 27 S.W.3d 548, 550 (Tex. Crim. App. 2000). The appellate court must also review the evidence in the light most favorable to the trial court's ruling and cannot reverse the trial judge's decision on the admissibility of evidence, absent a clear abuse of discretion. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *see Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000). If the trial court's findings are supported by the record, we are not at liberty to disturb them. *Green v. State*, 615 S.W.2d 700, 707 (Tex. Crim. App. [Panel Op.] 1980), *cert. denied*, 454 U.S. 952 (1981).

We review the trial court's application of the law under a *de novo* standard. *O'Hara*, 27 S.W.3d at 550. The trial court's ruling will be affirmed, if it is correct under any theory of law. *Romero*, 800 S.W.2d at 543; *Laca v. State*, 893 S.W.2d 171, 177 (Tex. App.--El Paso 1995, pet. ref'd).

The requirement that, before an accused's statement may be used against him, it must be shown that the statement was made freely and voluntarily, is of constitutional dimension. *Jackson v. Denno*, 378 U.S. 368, 376-78, 84 S. Ct. 1774, 1780-81 (1964). The Code of Criminal Procedure provides that a statement of an accused may be used in evidence against him, if it appears that it was freely and voluntarily made, without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art.

38.21. The determination of whether a confession was voluntary under the due process clause of the Fourteenth Amendment to the United States Constitution must be based upon examination of the totality of the circumstances surrounding its acquisition. *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985), *overruled on other grounds, Mosley v. State*, 983 S.W.2d 249, 264 (Tex. Crim. App. 1998).

Furthermore, in addressing the voluntariness of Appellant's statement, we note that intoxication, while relevant, does not render a confession involuntary per se. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997). Rather, it is a factor which the court must consider in making its evaluation. Specifically, the court must determine whether the defendant's intoxication rendered him incapable of making an independent, informed decision to confess. *Id.*

In this instance, there was adequate evidence that Appellant was capable of making an independent, informed decision. Several witnesses stated that Appellant was coherent and his speech was not slurred. The trial court, as the sole judge of the credibility of the witnesses, was free to believe the testimony countering Appellant's contentions, and to disbelieve Appellant and his witness. *See Pace v. State*, 986 S.W.2d 740, 748 (Tex. App.--El Paso 1999, pet. ref'd). Issue No. Four is overruled.

In Issue No. Five, Appellant asserts that the court erred by failing to include an instruction on the lesser-included offense of criminally negligent homicide in the jury charge during the guilt-innocence stage of trial. During the charge conference prior to the submission of the case to the jury at the guilt-innocence stage of trial, Appellant requested the jury be charged on the lesser-included offense of criminally negligent homicide. The court denied the request. The lesser-included offenses of murder and manslaughter were included in the charge of the court.

To determine whether a defendant is entitled to a charge on a lesser-included offense, we apply a traditional two-prong test. *See Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994); *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993); *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel Op.] 1981); *Bartholomew v. State*, 882 S.W.2d 53, 54-55 (Tex. App.--Houston [14th Dist.] 1994, pet. ref'd); *Ramirez v. State*, 976 S.W.2d 219, 226-27 (Tex. App.--El Paso 1998, pet. ref'd). First, the elements of the lesser-included offense must be included within the proof necessary to establish the offense charged. *Bignall*, 887 S.W.2d at 23; *Ramirez*, 976 S.W.2d at 227. Second, some evidence must exist in the record that would permit a jury rationally to find that, if the defendant is guilty, he is guilty only of the lesser offense. *Ramirez*, 976 S.W.2d at 227.

The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in making the determination of whether the lesser-included offense should be given. *See Gadsden v. State*, 915 S.W.2d 620, 622 (Tex. App.--El Paso 1996, no pet.); *Barrera v. State*, 914 S.W.2d 211, 212 (Tex. App.--El Paso 1996, pet. ref'd). Regardless of its strength or weakness, if any evidence raises the issue that the defendant was guilty of only the lesser offense, then the charge must be given. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992). An accused may be found guilty of only a lesser-included offense, if there is evidence that affirmatively rebuts or negates an element of the greater offense or if the evidence is subject to different interpretations, one of which rebuts or negates the crucial element. *See Ramirez*, 976 S.W.2d at 227.

It is not, however, sufficient that the jury merely disbelieves crucial evidence pertaining to the greater offense. *See Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997), *cert. denied*, 523 U.S. 1079 (1998). There must be some evidence directly germane to the lesser-included offense

for the jury to consider before an instruction on the lesser-included offense is warranted. *See Ramirez*, 976 S.W.2d at 227.

Manslaughter requires proof that the defendant acted recklessly, that is, that he consciously disregarded a substantial risk of which he was aware. *Gilbert v. State*, 196 S.W.3d 163, 165 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd). Criminally negligent homicide may be a lesser-included offense of involuntary manslaughter, which may be a lesser-included offense of murder, which may be a lesser-included offense of capital murder. *Gadsden*, 915 S.W.2d at 622. A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a). Criminal negligence occurs when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(d). The offense of criminally negligent homicide involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof, but fails to perceive the risk. *Goodman v. State*, 190 S.W.3d 823, 831 (Tex. App.--Fort Worth 2006, pet. ref'd). Simply because the defendant did not intend the result does not automatically entitle him to a charge on criminal negligence. *Wong v. State*, 745 S.W.2d 563, 565 (Tex. App.--Waco 1988, no pet.).

Appellant asserts that he did not perceive the risk of his conduct, because the amount of alcohol he ingested diminished his ability to perceive his surroundings. However, as stated earlier in this opinion, under the authority of Penal Code section 8.04(a), evidence of voluntary intoxication cannot be used to negate the culpable mental state of a crime. TEX. PENAL CODE ANN. § 8.04(a); *Hawkins v. State*, 605 S.W.2d 586, 589 (Tex. Crim. App. [Panel Op.] 1980). Furthermore, putting aside Appellant's intoxication, evidence that an accused knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another indicates a person who is aware of a risk created by that conduct and disregards the risk. *See Trujillo v. State*, 227 S.W.3d

164, 168 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd) (citing *Thomas v. State*, 699 S.W.2d 845, 850 (Tex. Crim. App. 1985)). Such an individual exhibits reckless conduct, at the least. *See Trujillo,* 227 S.W.3d at 168 (citing *Thomas*, 699 S.W.2d at 850).

The evidence indicated that Appellant was well aware of the risk created by his conduct, and he consciously disregarded that risk. He had previously fired the weapon. He admitted he was familiar with the gun. He knew how to load it, and he knew it was double action. He testified that he had loaded the gun at some time between the time he purchased it and when he killed Officer Barcena. He admitted shooting at the individuals in his garage. Appellant stated that, based upon his military experience, he knew how dangerous the gun was and that pointing and firing the weapon at a person could result in death. He affirmatively stated that he had exhibited reckless conduct in carrying the loaded weapon into the garage.

We find that there was no evidence to support the inclusion of criminally negligent homicide in the court's charge to the jury. Accordingly, we overrule Issue No. Five.

In Issue No. Six, Appellant maintains that the court erred by not quashing the indictment on the grounds that Penal Code section 19.03 is unconstitutional, in that the statute has become overly broad. While Appellant urges several grounds for quashing the indictment, he did not move to quash the indictment on this ground. Accordingly, Appellant has waived this contention, as it does not comport with any of the complaints made at trial. *See Leno v. State*, 934 S.W.2d 421, 423 (Tex. App.--Waco 1996), *pet. dism'd, improvidently granted,* 952 S.W.2d 860 (Tex. Crim. App. 1997); *Broxton v. State,* 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Issue No. Six is overruled.

In Issue No. Seven, Appellant argues that the court erred by not quashing the indictment on the ground that knowledge is not required when determining whether the Appellant knew the officer was acting in the course of his duties. A review of the record reveals that Appellant moved to quash

the indictment on the ground that the indictment failed to allege that he knew that Officer Barcena was acting in the lawful discharge of an official duty, not on the ground that the capital murder statute is unconstitutional by failing to require a defendant's knowledge that the peace officer was acting in the lawful discharge of an official duty. As Appellant's complaint on appeal does not comport with the contentions raised in the trial court, this issue is waived. *See Leno,* 934 S.W.2d at 423. Issue No. Seven is overruled.

In Issue No. Eight, Appellant asserts that the court erred by not quashing the indictment on the grounds that Penal Code section 19.03 is unconstitutional, in that the statute has created a class of murder victims. The Texas Rules of Appellate Procedure provide that a brief must contain a clear and concise argument for the contentions made, with appropriate citations to the authorities and to the record. *See* TEX. R. APP. P. 38.1(h). Appellant concedes in his brief that the law is well settled against his position. Further, he fails to present any pertinent argument directing this Court to his specific contentions on appeal. According, Appellant's issue is not properly briefed and the issue is waived. Issue No. Eight is overruled.

In Issue No. Nine, Appellant maintains that the court erred by not quashing the indictment on the grounds that Penal Code 19.03 is unconstitutional, in that the statute automatically creates a life sentence. Appellant did not raise this issue in his motion to quash the indictment. Accordingly, the complaint on appeal does not comport with the complaints raised in his motion to quash the indictment, and he has waived this issue on appeal. *See Hill v. State*, 78 S.W.3d 374, 382-83 (Tex. App.--Tyler 2001, pet. ref'd). Issue No. Nine is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.

KENNETH R. CARR, Justice

June 26, 2008

Before Chew, C.J., McClure, and Carr, JJ.

(Do Not Publish)